IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| CHANEL M. FALASCO, | ) |
| | ) |
| Plaintiff, | ) Case No. |
| | ) |
| v. | ) Judge |
| | ) |
| GUCCI AMERICA, INC., a New York corporation, | ) |
| | ) JURY TRIAL DEMANDED |
| Defendant. | ) |

## COMPLAINT

NOW COMES Plaintiff CHANEL M. FALASCO, by and through her attorneys THE LAW OFFICE OF RICHARD J. ZITO LLC and complaining of GUCCI AMERICA, INC. ("Gucci") states as follows:

**Preliminary Statement**

1. This is an action seeking redress for the violation of rights guaranteed to Plaintiff by Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. § 2000e, *et seq*. and the laws of the State of Illinois. Plaintiff seeks damages to redress Defendant's discriminatory employment practices and other unlawful conduct in connection therewith.

**Jurisdiction and Venue**

2. This Court has original jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1343 and 42 U.S.C. §2000e-5(f)(3). Regarding Plaintiff's state law claim (Count Three), this Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

3. The conduct giving rise to this action occurred in Chicago, Illinois and accordingly venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(2).

1

**Parties**

4. Plaintiff Chanel M. Falasco (hereinafter "Plaintiff" or "Falasco") is a female citizen of the United States who resides in Illinois.

5. Defendant Gucci America, Inc. (hereinafter "Defendant" or "Gucci") is a corporation organized and existing under the laws of the State of New York and which has at all times relevant hereto conducted and continues to conduct business in the State of Illinois.

6. Defendant Gucci has at all times relevant hereto continuously employed and continues to employ in excess of fifteen (15) employees.

7. Defendant Gucci is engaged in an industry affecting commerce and is an employer for the purposes of 42 U.S.C. § 2000e, *et seq*.

**Facts Common to All Counts**

8. Plaintiff was hired by Gucci, a retail purveyor of luxury goods and apparel, on or around June 25, 2014 to perform the duties of Sales Associate at its flagship boutique in downtown Chicago.

9. Beginning in the Fall of 2014, Byrne regularly began to make flirtatious overtures and sexually suggestive comments to Plaintiff. These overtures and comments were unwanted and unreciprocated by Plaintiff, but nevertheless Byrne persisted in making them.

10. The comments included telling Plaintiff that he "like[d] [her] booty" and asking her if she knew that she had "an amazing ass."

11. By October 2014, Byrne had invented a nickname—"Booty"—to call Plaintiff and regularly addressed her as such on the sales floor, often within the presence and earshot of other managerial staff.

12. Another pastime engaged in by Byrne involved the staff elevator, which connected Gucci's offices, employee lockers, and employees' entrance with the street-level sales floor.

13. Byrne would often attempt to time his own use of the elevator to coincide with that of Plaintiff.

14. On multiple occasions when he was successful in securing the privacy afforded by the elevator, Byrne would make unwanted physical advances of a sexual nature toward Plaintiff.

15. These included attempted kissing, groping, and grabbing Plaintiff's head, neck, torso, and buttocks. Plaintiff consistently refused these advances within the confined space of the elevator, by physically evading the contact and telling him to stop.

16. The unwanted nicknames, unwanted comments, repeated unwanted invitations to visit his apartment, and unwanted physical contact initiated by Byrne began to take a profound toll on Plaintiff's physical and emotional health. Specifically, she began to experience difficulty sleeping, increased anxiety levels, loss of appetite, and acute depression.

17. Sometime in November 2014 and again in December 2014, Plaintiff turned to the store's Selling Supervisor, one Amber Scott ("Scott") and confided in Scott about Byrne's conduct and its deleterious effects on her work experience and overall health.

18. Scott remarked that she was not surprised to learn of Byrne's conduct, but advised Plaintiff to "brush him off", "ignore it", and to "try to avoid working with him." Scott also rather unhelpfully suggested that Plaintiff should seek therapy if Byrne's workplace conduct "continued to be a problem for her."

19. One morning in early 2015, Plaintiff needed to retrieve some merchandise from a sixth-floor storeroom for a customer who had planned to come in and purchase it later that day.

20. Keys to the storeroom were provided only to managers, and Gucci policy dictated that any Sales Associate who required access would have to be accompanied by a manager.

21. Plaintiff advised Byrne of her need to retrieve the merchandise from the storeroom and he remarked sarcastically that it was "too bad" that he was the only manager present at that time and that as a result he would have to accompany her there.

22. Plaintiff and Byrne proceeded to the storeroom and Byrne opened the door for Plaintiff and then followed her inside.

23. Plaintiff walked up and down one aisle of hanging merchandise looking for the garment, while Byrne walked down a parallel aisle ostensibly to assist in the search.

24. Shortly thereafter, Byrne called out to Plaintiff to "come here" and when she turned around to determine where he was, she observed Byrne standing directly in front of her with his pants partially down and him holding his exposed genitalia in his hand. Byrne then suggested that she perform oral sex on him or "at least just touch it."

25. Horrified, Plaintiff momentarily froze and then began to slowly back away from Byrne and toward the storeroom exit and, eventually, the relative safety of the sales floor.

26. Unsure of her options and noting the absence of a dedicated human resources staff on site, Plaintiff sought out Elena Thomas ("Thomas"), who was then employed as Gucci's Operations Coordinator for the Chicago store.

27. Plaintiff asked Thomas to provide her with either an email address or phone number for Gucci's human resources department, a request at which Thomas balked.

28. Specifically, Thomas threw up her hands in a shrug-like gesture which Plaintiff understood to mean that Thomas did not want to get involved, and agitatedly told Plaintiff, "You're going to have to ask Amy [Hannaford, the store's general manager] about that."

29. A few weeks later, Plaintiff received her annual performance review, in which she received average scores.

30. As was typical practice, Gucci store management scheduled a time for its general manager, one Amy Hannaford, and its assistant general manager Byrne, to meet and discuss the performance review with Plaintiff.

31. While waiting with Plaintiff for General Manager Hannaford to arrive, Byrne commented to Plaintiff that her review would have been more favorable had "if [Plaintiff] had went [sic] along" with Byrne's sexual proposition in the storeroom some weeks earlier. Plaintiff was visibly aghast, whereupon Byrne then smiled and winked at her.

32. Shortly thereafter, Byrne was promoted to the position of Store Manager at a Gucci retail facility located in Coral Gables, Florida.

33. In light of her experiences hitherto and particularly in light of the performance review and the corresponding remark by Byrne referring to an abortive *quid pro quo* arrangement, Plaintiff reasonably perceived that her opportunities for advancement within Gucci were severely limited, that this limitation was a result of the sexual harassment perpetrated by Byrne, including the adverse consequences that flowed from her refusal to acquiesce to Byrne's sexual overtures and demands. Further, Plaintiff felt alienated from and insufficiently protected or supported by Gucci's management in connection with her prior efforts to deal with the harassment committed by Byrne.

34. On February 19, 2016, Plaintiff was required to complete an online training module regarding sexual harassment in the workplace. This was the first and only sexual harassment training she received during her tenure with the company.

35. The training module's content brought back to the fore Plaintiff's traumatic memories of her encounters with Byrne and made remaining a Gucci employee an intolerable prospect.

36.     Plaintiff tendered her resignation to Hannaford on February 22, 2016 and separated from employment with Gucci on February 29, 2016.

37.     Plaintiff perfected her Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") on March 24, 2016, styled as *Falasco v. Gucci America, Inc*. Charge No. 440-2016-02688.  A true and correct copy of the Charge of Discrimination is attached hereto as Exhibit 1.

38.     The EEOC issued a Letter of Determination, dated February 17, 2017, that evidence obtained during its investigation established cause to believe that Defendant Gucci discriminated against Plaintiff on the basis of her sex, in violation of Title VII.  A true and correct copy of the Letter of Determination is attached hereto as Exhibit 2.

39.     Efforts to resolve the matter through the EEOC's conciliation process were unsuccessful.

40.     On July 3, 2017, Plaintiff received from the EEOC a Notice of Right to Sue, dated June 28, 2017, in connection with the aforementioned Charge, entitling Plaintiff to initiate a civil action within ninety (90) days of receipt of said Notice.  A true and correct copy of this Notice is attached hereto as Exhibit 3.

**Count One**
**(Sexual Harassment)**
**(Hostile Work Environment)**

41.     Plaintiff repeats and re-alleges the allegations contained in each of the preceding paragraphs of the Complaint as if fully set forth herein.

42.     Plaintiff was routinely subjected by Defendant to persistent and unwanted contact of a sexually suggestive nature.

43.     Byrne, a manager and one of Plaintiff's immediate supervisors, repeatedly subjected Plaintiff to degrading comments, nicknames, questions about her romantic life, requests for dates

or to visit him at his apartment, and other verbal conduct inappropriate for the workplace. Plaintiff consistently and clearly rebuffed or otherwise conveyed her disinterest to these overtures, to no avail.

44. Byrne's harassing conduct quickly escalated to physical touching, grabbing, and attempted kissing, with Byrne often using the pretext of their supervisor-employee relationship to isolate Plaintiff in private. Plaintiff consistently and clearly rebuffed these physical advances as well.

45. Byrne's pattern of ongoing harassment managed to reach new heights (or depths) when he exposed his genitals to Plaintiff and demanded, unsuccessfully, that she orally or manually stimulate his penis.

46. Plaintiff reasonably perceived that Byrne's unwelcome and outrageous sexual conduct—and Gucci's tacit endorsement of said conduct—materially altered the terms and conditions of Plaintiff's employment and, accordingly, created a work environment that was intimidating, degrading, abusive, and hostile to Plaintiff.

47. The hostile work environment to which Plaintiff was subjected constituted a constructive discharge from employment with Defendant. Plaintiff, whose professional training and expertise is in the fashion industry, has been unable to obtain comparable employment since her departure.

48. Furthermore, the hostile work environment to which she was subjected during her tenure at Gucci caused Plaintiff to sustain physical and emotional injuries that continue to this day.

49. The nature of the harassment to which Plaintiff was subjected is sufficiently egregious to compel the conclusion that it was committed with the intention to cause said injuries.

**WHEREFORE**, Plaintiff prays this Court for entry of judgment in her favor and against Defendant as to this Count One and to award her relief commensurate with the proofs and the law including, without limitation, back pay, reinstatement or front pay, compensatory damages,

punitive damages, costs and fees associated with maintaining this action, and such other and further relief as the Court may deem just and proper.

## Count Two
### (Sexual Harassment)
### (Quid Pro Quo)

50. Plaintiff repeats and re-alleges the allegations contained in each of the preceding paragraphs of the Complaint as if fully set forth herein.

51. Although Plaintiff was concerned that rejecting the sexual overtures of a popular supervisor at a new job in her preferred vocational field might do damage to her career, she for the moment remained optimistic that professionalism would prevail and that her prospects for advancement would be unaffected by Byrne's inappropriate behavior and her adamant refusals to "go along."

52. Plaintiff's optimism was further buoyed by the fact that the informal feedback she had received from colleagues and supervisors in her first six months at Gucci was almost uniformly positive.

53. Plaintiff reasonably expected that her generally superior work performance would be reflected in her formal performance evaluation conducted by Defendant. When it was not, she was perplexed and concerned.

54. Plaintiff's worst suspicions and fears were realized when Byrne—a manager directly responsible for evaluating her performance—intimated to her that her evaluation was in fact adversely affected by her refusal to engage in sexual activity with him earlier that year.

55. Providing an employee with a negative performance review or evaluation constitutes a tangible employment action for the purposes of Title VII.

56. Byrne admitted in plain language to Plaintiff that her work performance evaluation was contingent upon her acquiescence (or failure to acquiesce) to his sexual advances.

57. Accordingly, Plaintiff was subjected by Defendant to *quid pro quo* sexual harassment and such harassment was perpetrated so egregiously as to compel the conclusion that it was committed with reckless indifference to the likelihood that it would cause severe emotional distress, which it did.

**WHEREFORE**, Plaintiff prays this Court for entry of judgment in her favor and against Defendant as to this Count Two and to award her relief commensurate with the proofs and the law including, without limitation, back pay, front pay or reinstatement, compensatory damages, punitive damages, costs and fees associated with maintaining this action, and such other and further relief as the Court may deem just and proper.

## Count Three
### (Negligent Retention and Supervision)

58. Plaintiff repeats and re-alleges the allegations contained in each of the preceding paragraphs of the Complaint as if fully set forth herein.

59. Upon information and belief, at all times relevant to this action Defendant was aware of at least three incidents evidencing Byrne's penchant for becoming sexually involved with his subordinates and casting doubt on his judgment and fitness to supervise others, particularly women.

60. During their November 2014 conversation about Byrne's sexual advances toward Plaintiff. Amber Scott indicated to Plaintiff that she (Scott) was not surprised to learn of Byrne's misconduct and disclosed that she had a brief, consensual sexual relationship with Byrne when both individuals worked for Louis Vuitton.

61. Scott further revealed that Defendant was aware of the prior relationship at all times relevant to this action.

62. Upon information and belief, in one such incident, a young female employee who was directly supervised by Byrne admitted to Defendant that she and Byrne had engaged in consensual sexual conduct after a company holiday party.

63. Upon information and belief, Byrne was not forthcoming with Defendant regarding his relationship with the employee and that Defendant had good cause to suspect his lack of candor.

64. Upon information and belief, Defendant raised some concerns with Byrne regarding his conduct during a business-related trip to Los Angeles, California in May 2013. Specifically, representatives of Defendant expressed concerns internally and to Byrne regarding Byrne's presence and conduct at a hotel pool party where illicit drugs and alcohol were reportedly in abundant supply.

65. The foregoing allegations enumerated within this Count III—those relating to Byrne's tendency to romantically pursue female subordinates, his lack of professionalism and questionable decision making and of which Defendant was plainly aware—comprise a mosaic of conduct and character that raises grave doubts about Byrne's fitness to fulfill the job duties of assistant general manager in a manner compliant with Title VII as well as Defendant's own corporate anti-harassment policy.

66. Defendant owed Plaintiff a duty to exercise reasonable care in its retention of employees, particularly those employees in whom it entrusted with supervisory authority.

67. Defendant breached that duty by continuing to employ Byrne in a management role, particularly to the extent that such a role would likely require him to exercise supervisory authority over others.

68. Defendant's breach was the proximate cause of Plaintiff's injuries resulting from Byrne's continued employment with Gucci as Plaintiff's supervisor.

69. Defendant further owed Plaintiff a duty to exercise reasonable care in its supervision of employees, particularly those employees in whom it entrusted with supervisory authority and whose previous conduct provided ample warnings of specific potential for unlawful or harmful conduct.

70. Defendant breached that duty by failing to adequately supervise and monitor Byrne and his behavior with young female subordinates.

71. Defendant's breach was the proximate cause of Plaintiff's injuries resulting from Byrne's continued employment with Gucci as Plaintiff's supervisor.

**WHEREFORE**, Plaintiff prays this Court for entry of judgment in her favor and against Defendant as to this Count Three and to award her relief commensurate with the proofs and applicable law including, without limitation, compensatory damages, punitive damages, costs and fees associated with maintaining this action, and such other and further relief as the Court may deem just and proper.

### Jury Demand

72. Plaintiff hereby demands a jury trial on all issues so triable.

Dated: September 29, 2017                              Respectfully submitted,

By:    **/s/ Richard J. Zito, Esq.**
Richard J. Zito, Esq. (ARDC #6291139)
LAW OFFICE OF RICHARD J. ZITO LLC
Attorneys for Plaintiff
200 East Randolph Drive, Suite 5100
Chicago, Illinois 60601
(312) 883-5298